JASON R. MAIER, ESQ.
Nevada Bar No. 8557
DANIELLE J. BARRAZA, ESQ.
Nevada Bar No. 13822
**MAIER GUTIERREZ & ASSOCIATES**
8816 Spanish Ridge Avenue
Las Vegas, Nevada 89148
Telephone: 702.629.7900
Facsimile: 702.629.7925
E-mail: jrm@mgalaw.com
djb@mgalaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ERENDIRA DOMINGUEZ, individually, and ALLISON LOPEZ, individually<br><br>Plaintiffs,<br><br>vs.<br><br>ARIA RESORT & CASINO, LLC, a domestic limited liability company; MGM RESORTS INTERNATIONAL; a foreign corporation DOES I-X; and ROE BUSINESS ENTITIES I-X, inclusive,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs ERENDIRA DOMINGUEZ and ALLISON LOPEZ ("Plaintiffs"), by and through their attorneys of record, the law firm MAIER GUTIERREZ & ASSOCIATES, hereby demand a trial by jury and complain and allege against ARIA RESORT & CASINO, LLC, a domestic limited liability company ("Aria"); MGM RESORTS INTERNATIONAL, a foreign corporation ("MGM Reosrts"); and DOES I-X; and ROE BUSINESS ENTITIES I-X, inclusive (collectively, "Defendants") as follows:

**JURISDICTION, VENUE, AND LEGAL BASIS FOR THIS ACTION**

1. This Court possesses jurisdiction over the matter under 28 U.S.C. § 1331 because

Plaintiff's claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

2. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because "a substantial part of the events or omissions giving rise to the claim[s] occurred" in Nevada.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

3. On or about July 12, 2024, Plaintiffs each filed a formal Charge of Discrimination with the Nevada Equal Rights Commission ("NERC"). These filings with NERC, which were concurrently dual-filed with the Equal Employment Opportunity Commission ("EEOC"), fulfilled Plaintiffs' obligations to initiate an administrative claim before seeking review in this Court.

4. In their Charges of Discrimination, Plaintiffs alleged facts demonstrating that they had been discriminated against and discharged due their sex (female) and national origin (Hispanic).

5. On or about July 15, 2024, the EEOC issued Plaintiff Dominguez a "Determination and Notice of Rights" letter stating that she would have within 90 days of the letter's receipt to file suit. *See* **Exhibit 1**, Dominguez Determination and Notice of Rights Letter.

6. On or about July 16, 2024, the EEOC issued Plaintiff Lopez a "Determination and Notice of Rights" letter stating that she would have within 90 days of the letter's receipt to file suit. *See* **Exhibit 2**, Lopez Determination and Notice of Rights Letter.

7. Plaintiffs have met all administrative prerequisites to bring this lawsuit and have timely filed this lawsuit within 90 days of receiving their respective Determination and Notice of Rights Letters.

**PARTIES AND "JOINT EMPLOYER" RELATIONSHIP BETWEEN DEFENDANTS**

8. Plaintiff ERENDIRA DOMINGUEZ ("Plaintiff Dominguez") is, and at all times pertinent hereto was, a resident of Clark County, Nevada.

9. Plaintiff ALLISON LOPEZ ("Plaintiff Lopez") is, and at all times pertinent hereto was, a resident of Clark County, Nevada.

10. Upon information and belief, defendant ARIA RESORT & CASINO, LLC is, and at all times pertinent hereto was, a domestic limited liability company authorized to conduct business in Clark County, Nevada.

11. Defendant ARIA RESORT & CASINO is the corporate entity that issued paychecks

to Plaintiffs at all relevant times.

12. Upon information and belief, Defendant MGM RESORTS INTERNATIONAL is, and at all times pertinent hereto was, a foreign corporation authorized to conduct business in Clark County, Nevada.

13. Aria is the entity that issued Plaintiffs their pay checks.

14. With respect to this matter, MGM Resorts is not a mere "parent" entity to Aria. Rather, MGM Resorts was actively involved in and had control over the terms and conditions of Plaintiffs' employment. Specifically, MGM Resorts took the lead in "investigating" the Plaintiffs, and was the entity that issued termination letters to the Plaintiffs. The termination decisions were not made solely by Aria, but were made in conjunction with MGM Resorts, which had direct control, approval, and involvement over these decisions.

15. MGM Resorts directly participated in and influenced the employment policies of Aria when it came to Plaintiffs specifically.

16. As such, with respect to this matter, Aria and MGM Resorts were "joint employers" of Plaintiffs, as that term is recognized in Title VII matters.

17. Plaintiffs are not familiar with the complex corporate interrelationships through which the named defendant ARIA RESORT & CASINO and MGM RESORTS INTERNATIONAL jointly operate the Aria building, where Plaintiffs were employed. Thus, the true names and capacities, whether individual, corporate, subsidiary, associate, partnership, joint ventures or otherwise, of these fictitious (additional) defendants herein designated as DOES I through X and ROE CORPORATIONS I through X, inclusive. Their identities and names are unknown to Plaintiffs at this time, who therefore sue these defendants by fictitious names.

18. These fictitious defendants, acting with or at the discretion of the named Defendants, may also be responsible and therefore liable for the injurious conduct or illegal conduct which harmed Plaintiffs. Plaintiffs will seek leave of the Court to insert the true names and capacities of such Defendants when the same have been ascertained and will further seek leave to join said Defendants in these proceedings.

19. Defendants engage in activities which affect interstate commerce and they employed

more than 15 employees in the timeframes required and thus are subject to both the Nevada statutes and federal statutes prohibiting discrimination.

## GENERAL ALLEGATIONS

### FACTUAL ALLEGATIONS GENERALLY APPLICABLE TO ALL CLAIMS

20. Plaintiffs are both Hispanic-American women, who were employed full-time at Aria since its opening in late 2009.

21. Plaintiff Lopez worked at Aria as the Casino Marketing Manager.

22. Plaintiff Dominguez worked at Aria as the Casino Marketing Coordinator.

23. Plaintiffs have a dedicated decades-long history of providing quality service to MGM properties throughout Las Vegas, Nevada.

24. Prior to her employment at Aria, Plaintiff Lopez was hired by MGM in September 1998 as a Casino Porter; she also worked at Bellagio for many years before being selected to help open Aria.

25. Plaintiff Dominguez had also worked at Bellagio and then the Mirage for many years prior to being selected to transition to Aria for its opening.

26. As a mid-level "marketing manager" (Plaintiff Lopez) and a lower-level "marketing coordinator"), Plaintiffs' job duties consisted of following orders from upper management on providing services to Aria's marketing and promotional client accounts.

27. Plaintiffs were never actually in charge of any marketing division accounts at Aria.

28. Plaintiffs did not have access or control over the use or transfer of monetary funds used for Aria's marketing division.

29. Specifically relevant to this action, Plaintiffs were involved in booking hotel rooms for the Las Vegas Golf Adventures ("LVGA") account under direction from their supervisors; Senior Executives at Aria, including Daniel Paolella, Nick Monte, Taylor Gwiazdon, and Zachary Malisow.

30. Upon information and belief, the LVGA account involved contracts with not just Aria, but other casino resorts under the MGM Resorts umbrella, including Bellagio, Mandalay Bay, Park MGM, Cosmopolitan, and Mirage.

31. Upon information and belief (including from an investigator who directly told this

information to Plaintiff Lopez), the LVGA account (including the spending and usage of this account) was documented by way of weekly reports that were circulated to upper management at Aria, including Plaintiff Lopez's direct supervisor, Daniel Paolella, who was on notice of what was happening with that account on a consistent basis.

32. Under the direction and supervision of Plaintiffs' superiors, Plaintiffs booked rooms under the LVGA account from approximately 2021-2023.

33. At some point in 2023, Justin Andrews (who had already been with MGM) was promoted to the position of VP of national marketing for Aria).

34. Shortly after Justin Andrews came on board at Aria in 2023, Mr. Andrews baselessly speculated that Plaintiff Lopez was booking the LVGA reservations for her own personal usage. There was no truth to this, but the accusation ultimately snowballed into MGM Resorts and Aria falsely accusing Plaintiffs of committing serious financial crimes involving the alleged fraudulent transfer of monies associated with the LVGA account.

35. Alex Isaac, the LVGA rep who worked with MGM properties on the LVGA account, ended up sending MGM and Aria proof of all of the LVGA reservations that were in the system, along with proof that he requested them for his LVGA clients.

36. Nevertheless, Defendants still baselessly claimed that "millions of dollars" worth of funds had supposedly gone missing as it related to the LVGA account.

37. The accusation from Defendants was nonsensical, especially because Plaintiffs had no access to the account funds themselves, nor did Plaintiffs have the ability to withdraw or transfer any monetary funds to separate accounts.

38. The (male) senior executives at Aria/ MGM Resorts, including Nick Monte, Taylor Gwiazdon, and Zachary Malisow were the ones actually directing the booking of hotel rooms associated with this account and had the ability to spend account trade money.

39. At no point did Daniel Paolella, Plaintiff Lopez's immediate supervisor, instruct Plaintiffs to cease their standard work of booking rooms on the LVGA account.

40. Upon information and belief, MGM Resorts conducted an "investigation" into the purported missing LVGA account trade funds.

41. On or about August 30, 2023, MGM Resorts and Aria abruptly placed both Plaintiffs Dominguez and Lopez on a suspension pending investigation, supposedly so that they could investigate how "millions of dollars" worth of LVGA trade account funds had disappeared and where the funds were sent.

42. Defendants failed to provide any timeline for Plaintiffs as to how long this purported "investigation" would last.

43. Plaintiff Lopez received her salary for a period of 6 weeks during the suspension period.

44. Plaintiff Dominguez's suspension period was completely unpaid (and lasted over three months).

45. Plaintiffs later learned that the male senior executives were never placed on an unpaid suspension pending Defendants' investigation – only the Hispanic female Plaintiffs had to endure that adverse treatment.

46. On September 7, 2023, Plaintiffs Lopez and Dominguez received an email from Lia Puia (an MGM Resorts employee relations representative) stating the matter was still under investigation and that the company would get back to them when they were ready.

47. After Lia Puia's September 7, 2023 email, two months went by without Defendants providing an update to Plaintiffs.

48. On November 10, 2023, MGM Resorts' Chief Gaming Officer Doug Seidenberg called Plaintiff Lopez and asked if she would meet with him at a Starbucks to discuss the matter.

49. Plaintiff agreed to this meeting, and assumed that a Human Resources representative would also be participating to discuss an update on Defendants' "investigation" into the purportedly missing LVGA account funds.

50. On November 11, 2023, Plaintiff Lopez met with Doug Seidenberg at a Starbucks at approximately 3:00 p.m.

51. To Plaintiff Lopez's surprise only Mr. Seidenberg showed up on behalf of Defendants for this in-person meeting which took place in a coffee shop open to the public.

52. During the November 11, 2023 Starbucks meeting, Mr. Seidenberg bluntly told

Plaintiff Lopez that neither she nor Plaintiff Dominguez would ever be coming back to work for Aria, and that it was "unfortunate" that the two people who are losing their jobs had nothing to do with the issue.

53. During the November 11, 2023 Starbucks meeting, Mr. Seidenberg also stated it was frustrating for him and the investigators that there were two "senior leaders" in the company that he is pretty sure were in the wrong, but they have no proof.

54. During the November 11, 2023 Starbucks meeting, Mr. Seidenberg had no answers as to why Plaintiff Lopez and Dominguez's suspension periods were lasting so long.

55. During the November 11, 2023 Starbucks meeting, Plaintiff Lopez mentioned that she had worked at MGM Resorts properties for 25 years and had never seen nor heard of a suspension pending investigation lasting for many months without any answers or even an update to the employee waiting to hear back from the company.

56. During the November 11, 2023 Starbucks meeting, Mr. Seidenberg claimed that he was "working on a really good severance package" for Ms. Lopez in light of the many years she had put into the company. No severance package was ever offered.

57. On or about December 6, 2023, Ms. Lopez emailed MGM Resorts representatives Jyoti Chopra, Ashley Eddy, Lia Puia, and Sherri Sosa, summarizing her meeting with Mr. Seidenberg and mentioning that due to the obvious neglect of the "investigation," both she and Plaintiff Dominguez were feeling discriminated against "as not only women, but Hispanics as well." Plaintiff Lopez explained that the Plaintiffs felt this way because the Caucasian males who held positions of power (and who Mr. Seidenberg even alluded to being at fault for the whole situation) were not subjected to the same adverse treatment.

58. In her December 6, 2023 email, Plaintiff Lopez detailed that as someone who has been working in the casino industry for decades, she felt "extremely disrespected during this process," and explained that her reputation had "taken a serious hit due to the ugly, horrendous, and false rumors" that were spreading throughout the casino industry.

59. As background on these rumors, word got back to Plaintiffs that many people in the casino industry were openly speculating that Plaintiffs would soon be arrested for committing crimes

and stealing millions of dollars from Aria or the LVGA account and getting away with it.

60. To be clear, to date, neither Plaintiff Dominguez nor Plaintiff Lopez have ever been arrested for anything, let alone charged or convicted of any crimes.

61. Also on December 6, 2023, Plaintiff Dominguez emailed correspondence to Ashley Robertson (VP of Human Resources at Aria) and cc-ed MGM employee relations rep Lia Puia. This email indicated that Plaintiff Dominguez had not received a single update on the investigation for three months. Plaintiff Dominguez also indicated that she felt she and Plaintiff Lopez were being discriminated against as Hispanic women.

62. Plaintiffs' emails and reports of workplace discrimination apparently got Defendants' attention, as they set up a meeting with Plaintiff Lopez for the following week.

**DEFENDANTS' MEETING WITH PLAINTIFF LOPEZ**

63. On or about December 11, 2023, Defendants' VP of Corporate Human Resources Diana Castrillon and Corporate Manager of Human Resources Gabriela Rosado-Varsic verbally conferred with Plaintiff Lopez via Microsoft Teams virtual meeting, as part of Defendants' supposed "investigation."

64. The December 11, 2023 meeting was not a wire phone call, rather it was a virtual video-conference meeting.

65. One of the first things Ms. Castrillon demanded during the December 11, 2023 virtual meeting was that Plaintiff Lopez not record the meeting, as Defendants did not want any record of what was being said. This was strange to Plaintiff, who of course thought it would be good practice to have a record of what was said, which could be referred back to by Defendants as they continued their alleged "investigation."

66. It soon became clear why Defendants did not want the meeting recorded, as Ms. Castrillon used the investigatory meeting as a means to interrogate and falsely accuse Plaintiffs of committing crimes.

67. During the December 11, 2023 meeting, Ms. Castrillon falsely accused Plaintiff Lopez of "managing the entire process," meaning the LVGA account. Plaintiff Lopez responded that of course she was as not "managing" anything, and that her involvement and responsibility was minimal.

68. During the December 11, 2023 meeting, Ms. Castrillon falsely accused Plaintiffs of "managing something after being told not to do so." Plaintiff Lopez responded that the accusation made no sense, because Daniel Paolella (her boss) received weekly emails on the LVGA account, and despite having that notice, he did not tell Plaintiffs not to work on the account and book rooms when asked. Nor did Daniel Paolella tell Plaintiffs that the LVGA was over-comped by (supposedly) a million dollars in 2023. Ms. Castrillon appeared surprised that Plaintiff Lopez knew about these weekly emails, and asked how Plaintiff Lopez got that information. Plaintiff Lopez responded that a prior investigator literally showed the emails to her, and this information appeared to visibly upset Ms. Castrillon.

69. During the December 11, 2023 meeting, Ms. Castrillon said, verbatim, the following:

> During the investigatory process, there were two properties that are in your name. Just wondering, how can you afford two properties, two homes, on the salary that you have?

70. Plaintiff Lopez was appalled that Defendants were seriously asking her how she could afford to own two pieces of real estate (one of which was her personal residence).

71. Plaintiff Lopez even asked Ms. Castrillon "You think LVGA bought my house?" She also asked for clarification as to whether the Defendants really investigated her assets, as this was shocking to hear.

72. Plaintiff Lopez then went into painstaking detail as to exactly how she could afford to own the homes that she owned, including the fact that she and her husband purchased a four-plex in 1995 and sold it in 1998 for a substantial profit, then purchased another home for approximately $98,000 which they ended up selling in 2004 or 2005 for approximately $420,000. Plaintiff Lopez also went into detail about the additional jobs and business ventures that her husband is involved in.

73. It was humiliating and degrading for Plaintiff Lopez to have to actually explain to Defendants (her employer) how she could afford to purchase the homes that she owned, as Defendants apparently could not fathom that a Hispanic-American woman earning a paltry salary from Aria could achieve real estate success in America and become a homeowner, let alone own numerous properties. Plaintiff Lopez was incredibly disappointed and disgusted by her employer's line of questioning.

74. Ms. Castrillon was not able to identify any evidence that Defendants had uncovered

purportedly linking Plaintiff Lopez's purchase of her homes to any nefarious activity having to do with the LVGA accounts. This was just a blind guess by Defendants because it did not add up to them that Plaintiff Lopez could be a successful real estate investor in her own right.

75. Plaintiff Lopez found the investigatory meeting with Ms. Castrillon and Ms. Rosado-Varsic to be largely unproductive, as it became apparent during that meeting that Defendants were placing the unrealistic expectation and burden on Plaintiffs to somehow figure out and explain the whereabouts of "missing funds" that they never managed nor were in charge of – nor even had the capability of moving. And when Plaintiff Lopez could not deliver information that she did not have access to in light of her very limited involvement in the LVGA account, Ms. Castrillon aggressively insinuated that Plaintiff Lopez must have had something to do with it because how could she afford her homes otherwise. Unfortunately, at no point during the meeting did Defendants promise not to retaliate against Plaintiff Lopez for reporting the workplace discrimination that was clearly taking place. This left Plaintiff Lopez feeling more anxious and uneasy about being thrown under the bus for the activities of her Caucasian male counterparts and superiors.

**DEFENDANTS' MEETING WITH PLAINTIFF DOMINGUEZ**

76. Because of her work status being marked as an unpaid suspension but still employed, Plaintiff Dominguez was unable to obtain unemployment benefits throughout the entire time Defendants were conducting their very long "investigation."

77. After Plaintiff Lopez had her virtual meeting on December 11, 2023, Defendants met with Plaintiff Dominguez.

78. During Plaintiff Dominguez's meeting (which was also attended by Ms. Castrillon and Ms. Rosado-Varsic), Ms. Castrillon engaged in the classic tactic of trying to pit Plaintiffs Dominguez and Lopez against each other, by claiming that Plaintiff Lopez said during her investigation that she never directed Plaintiff Dominguez to book the rooms in question. This was a lie, and did not work, as Plaintiffs were simply doing what they had been told by their upper management with respect to the LVGA account, which did include booking rooms, which upper management had access to viewing and received weekly reports on.

79. Throughout the entire meeting, Defendants never provided an explanation to Plaintiff

Dominguez as to why she and Plaintiff Lopez were being singled out for adverse treatment (suspensions) instead of the Caucasian male executives who were actually involved in and directing the transfer of the LVGA funds.

80. Similar to Plaintiff Lopez, Plaintiff Dominguez felt that her "meeting" was for the most part a waste of time, as it was clear that Defendants were not interested in actually getting to the bottom of what happened, and were more focused on finding some way to pin it on the lower and mid-level Hispanic women employees (Plaintiffs) and move on.

**DEFENDANTS WRONGFULLY TERMINATE PLAINTIFFS' EMPLOYMENT**

81. On or around December 21, 2023, Gabriela Rosado-Carsic from MGM Resorts employee relations called Plaintiff Dominguez and stated Aria would give her 24 hours to voluntarily resign or she would be fired. No explanation was provided as to why Plaintiff Dominguez was being given this "option" with no notice—nor did Aria explain what evidence (if any) they found actually linking her to the supposed millions of missing dollars.

82. On December 21, 2023, Ms. Rosado-Carsic emailed Plaintiff Dominguez, stating "Per our conversation earlier, the outcome of the investigation resulted in separation, and I will follow up tomorrow morning as agreed to confirm if you elect to resign in lieu of separation, otherwise the separation for cause will stand."

83. Plaintiff Dominguez refused to terminate her own employment, as she had done nothing wrong.

84. On or about December 22, 2023, MGM Resorts employee relations director Gabriela Rosado-Carsic emailed Ms. Dominguez a separation letter. Defendants' letter claimed that the separation was due to "multiple violations" of Defendants' rules of conduct, including "theft," "dishonesty," and "engaging in any unethical behavior for personal gain." No actual details were provided substantiating any of these purported "reasons" for terminating plaintiff Dominguez. The separation letter also claimed that Plaintiff "personally benefited from the LVGA account by receiving multiple gifts," but failed to go into any details as to what these purported "gifts" Plaintiff Dominguez received were.

85. As such, the incredibly shoddy investigation by Defendants led to a bare-bones

separation letter which was strong on accusations but weak on actual details.

86. On or about December 22, 2023, Aria emailed Plaintiff Lopez a separation letter, which accused her of "disregarding the executive directive to stop comp rooms for the LVGA account, which resulted in untraceable trade funds," and "engag[ing] in unethical behavior for personal gain." No actual details were provided supporting that conclusory statement.

87. There was no actual "executive directive" to stop comp rooms for the LVGA account. To the contrary, Plaintiffs' upper management was completely on notice of all rooms being booked and comped on the LVGA account via weekly emails that were sent to Plaintiffs' direct supervisor Daniel Paolella.

88. Upon information and belief, Nick Monte, an upper executive who was heavily involved in the LVGA account and did have access to trade funds (unlike Plaintiffs), was investigated by Defendants and ultimately transferred to another location in Ohio as a result of his actions, but still works for Defendants.

89. Upon information and belief, Taylor Gwiazdon, an upper executive who was heavily involved in the LVGA account and did have access to trade funds (unlike Plaintiffs), was investigated by Defendants and was allowed to resign with severance instead of being terminated by the company.

90. As a result of Defendants' mistreatment and discrimination, both Plaintiffs Dominguez and Lopez have suffered severe emotional distress.

91. Plaintiff Lopez was forced to cash out her 401(k) due to the excessively long suspension without pay period just so that she could pay her bills.

92. Plaintiff Dominguez depleted much of her life savings as a result of being placed on such a long suspension without pay.

93. Both Plaintiffs have had to undergo extensive therapy after being railroaded by the company that they naively considered their family.

94. Upon information and belief, Plaintiffs have been blacklisted from the casino industry, as many people in the business have heard about what happened to them and assume that they are going to jail for committing serious financial crimes which in reality they had no involvement in.

/ / /

**FIRST CLAIM FOR RELIEF**

**Violation of Title VII – 42 U.S.C § 2000e-2(a)(1) – Disparate Treatment (National Origin/ Race and Sex Discrimination)**

95. Plaintiffs repeat and re-allege the allegations of the preceding paragraphs of the complaint as though fully set forth herein and incorporate the same herein by reference.

96. Plaintiffs are members of protected classes as Hispanic women.

97. As detailed above, Aria repeatedly and intentionally subjected Plaintiffs to discrimination and adverse employment actions based on and because of Plaintiffs' national origin, race, and sex, which sufficiently altered the benefits, privileges, and terms and conditions of Plaintiffs' employment. Examples include: placing Plaintiffs on a suspension (completely unpaid for Plaintiff Dominguez) for many months while supposedly conducting an "investigation," whereas the non-Hispanic male employees who were also supposedly investigated were not placed on a suspension; placing a burden on Plaintiffs (and only Plaintiffs) to figure out and tell the investigators exactly where the "missing money" went, even though Plaintiffs had no access to or ability to transfer any actual trade funds from the LVGA account; and terminating Plaintiffs' employment when Defendants apparently were unable to determine what happened to the "missing funds" that they were investigating.

98. This adverse treatment was sex and national origin/ race based, and similarly situated employees who were not Hispanic women were not subjected to the same discriminatory conduct.

99. The conduct Plaintiffs were subjected to was unwelcome to Plaintiffs, as Plaintiffs repeatedly and openly communicated during their interrogations and suspensions.

100. Further, Defendants exhibited no good faith efforts to comply with the law, as seen by Defendants' neglect, malice, and reckless disregard concerning Plaintiffs' complaints of workplace discrimination.

101. Plaintiffs are entitled to recover punitive damages for Defendants' malicious and intentional violations of federal and state anti-discrimination laws. Plaintiffs are entitled to recover punitive damages in an amount sufficient to punish Defendants for their illegal conduct and to deter other employers from engaging in such conduct in an amount to be determined by the jury deemed

sufficient to do so.

102. As a result of Defendants' actions, Plaintiffs suffered lost wages, mental anguish, inconvenience, and loss of enjoyment of life.

103. As a result of Defendants' actions, it has been necessary for Plaintiffs to retain the services of attorneys and they are entitled to reasonable costs and attorneys' fees.

## SECOND CLAIM FOR RELIEF

**Violation of NRS 613.330 – Unlawful Deprivation of Employment (National Origin/ Race and Sex Discrimination)**

104. Plaintiffs repeat and re-allege the allegations of the preceding paragraphs of the complaint as though fully set forth herein and incorporate the same herein by reference.

105. As detailed above, Aria repeatedly and intentionally subjected Plaintiffs to discrimination and adverse employment actions based on and because of Plaintiffs' national origin, race, and sex, which sufficiently altered the benefits, privileges, and terms and conditions of Plaintiffs' employment. Examples include: placing Plaintiffs on a suspension (completely unpaid for Plaintiff Dominguez) for many months while supposedly conducting an "investigation," whereas the non-Hispanic male employees who were also supposedly investigated were not placed on a suspension; placing a burden on Plaintiffs (and only Plaintiffs) to figure out and tell the investigators exactly where the "missing money" went, even though Plaintiffs had no access to or ability to transfer any actual trade funds from the LVGA account; and terminating Plaintiffs' employment when Defendants apparently were unable to determine what happened to the "missing funds" that they were investigating.

106. Other similarly situated and superior Defendant employees who are not Hispanic women were not exposed to the same discriminatory conduct.

107. As a result of Defendants' actions, Plaintiffs have suffered lost wages, mental anguish, inconvenience, and loss of enjoyment of life.

108. As a result of Defendants' actions, it has been necessary for Plaintiffs to retain the services of attorneys and they are entitled to reasonable costs and attorneys' fees.

/ / /

**THIRD CLAIM FOR RELIEF**

**Violation of Title VII – 42 U.S.C § 2000e-3(a) – Retaliation**

109. Plaintiffs repeat and re-allege the allegations of the preceding paragraphs of the complaint as though fully set forth herein and incorporate the same herein by reference.

110. Plaintiff Dominguez engaged in a protected activity when she complained to Defendants' HR department on December 6, 2023, and again on December 11, 2023, regarding feeling discriminated against based on her protected status as a Hispanic woman.

111. Defendants terminated Plaintiff Dominguez's employment just days after she lodged her complaint, pretextually claiming that she had engaged in "theft," "dishonesty," and "unethical behavior for personal gain." This was a pretextual reason, as reflected by the lack of any substantive details or evidence substantiating these claims.

112. No legitimate reason was provided by Defendants to Plaintiff Dominguez as for why she was being terminated, such as documented poor work performance, unexcused absences, or tardies.

113. Defendants terminated Plaintiff Dominguez because of her complaint regarding the Caucasian males in her department not having to be placed on suspension without pay despite being the ones who actually controlled the trade funds in the LVGA account.

114. Defendants' decision to terminate Plaintiff Dominguez's employment approximately 11 days after her last report of workplace discrimination to HR is reasonably likely to deter any employee form engaging in a protected activity, and therefore, was plainly retaliatory in violation of Title VII.

115. As a result of Defendants' actions, Plaintiff Dominguez has suffered lost wages, mental anguish, emotional distress, inconvenience, and loss of enjoyment of life.

116. As a result of Defendants' actions, it has been necessary for Plaintiff Dominguez to retain the service of attorneys and she is entitled to reasonable costs and attorneys' fees.

**FOURTH CLAIM FOR RELIEF**

**Violation of NRS 613.340 – Retaliation**

117. Plaintiffs repeat and re-allege the allegations of the preceding paragraphs of the

complaint as though fully set forth herein and incorporate the same herein by reference.

118. Plaintiff Dominguez engaged in a protected activity when she complained to Defendants' HR department on December 6, 2023, and again on December 11, 2023, regarding feeling discriminated against based on her protected status as a Hispanic woman.

119. Defendants terminated Plaintiff Dominguez's employment just days after she lodged her complaint, pretextually claiming that she had engaged in "theft," "dishonesty," and "unethical behavior for personal gain." This was a pretextual reason, as reflected by the lack of any substantive details or evidence substantiating these claims.

120. No legitimate reason was provided by Defendants to Plaintiff Dominguez as for why she was being terminated, such as documented poor work performance, unexcused absences, or tardies.

121. Defendants terminated Plaintiff Dominguez because of her complaint regarding the Caucasian males in her department not having to be placed on suspension without pay despite being the ones who actually controlled the trade funds in the LVGA account.

122. Defendants' decision to terminate Plaintiff Dominguez's employment approximately 11 days after her last report of workplace discrimination to HR is reasonably likely to deter any employee form engaging in a protected activity, and therefore, was plainly retaliatory in violation of Title VII.

123. As a result of Defendants' actions, Plaintiff Dominguez has suffered lost wages, mental anguish, emotional distress, inconvenience, and loss of enjoyment of life.

124. As a result of Defendants' actions, it has been necessary for Plaintiff Dominguez to retain the service of attorneys and she is entitled to reasonable costs and attorneys' fees.

**DEMAND FOR JURY TRIAL**

125. Pursuant to the Seventh Amendment of the United States Constitution, Plaintiffs invoke their right to trial by jury in this civil action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Erendira Dominguez and Allison Lopez pray for judgment against Defendants, and each of them, as follows:

1. For a judgment in favor of Plaintiffs against Defendants, and each of them, on the complaint and all claims for relief asserted therein;

2. For an award of economic damages in an amount sufficient to make Plaintiffs whole for past and future lost income and benefits and other economic losses suffered by Plaintiffs resulting from Defendants' conduct;

3. For an award of compensatory damages from mental anguish, emotional distress, pain and suffering, humiliation, harm to reputation, and other losses incurred by Plaintiffs as a result of Defendants' conduct;

4. For injunctive relief in the form of reinstatement to their job positions with appropriate corrective measures put in place to ensure Defendants will no longer violate anti-discrimination laws;

5. For an award of prejudgment and post-judgment interest;

6. For an award of punitive damages;

7. For an award of attorney's fees, costs, and related expenses pursuant to § 706(k) of Title VII, 42 U.S.C. § 2000e-5(k) and other corresponding federal and state law; and

8. For an award of such other relief the Court may deem just and proper.

DATED this 9th day of September, 2024.

Respectfully submitted,

**MAIER GUTIERREZ & ASSOCIATES**

*/s/ Danielle J. Barraza*

JASON R. MAIER, ESQ.
Nevada Bar No. 8557
DANIELLE J. BARRAZA, ESQ.
Nevada Bar No. 13822
8816 Spanish Ridge Avenue
Las Vegas, Nevada 89148
*Attorneys for Plaintiffs*